FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| REBECCA MORRIS, individually and on behalf of all others similarly situated; BECKY EBENKAMP, individually and on behalf of all others similarly situated, *Plaintiffs-Appellants*, v. CALIFORNIA PHYSICIANS' SERVICE, DBA Blue Shield of California; DOES, 1–10, inclusive, *Defendants-Appellees*. | No. 17-55878 D.C. No. 2:16-cv-05914-JAK-JPR OPINION |

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted October 10, 2018
Pasadena, California

Filed March 18, 2019

Before: Mary M. Schroeder and Jacqueline H. Nguyen, Circuit Judges, and Thomas J. Whelan,[*] District Judge.

Opinion by Judge Schroeder

## SUMMARY[**]

### Patient Protection and Affordable Care Act

The panel affirmed the district court's dismissal of a claim that plaintiffs' insurer violated the Patient Protection and Affordable Care Act's "Medical Loss Ratio" provision.

This provision of the ACA requires an insurer to pay a rebate to enrollees if the ratio between what it pays out in claims for medical services is less than 80% of the revenue it takes in. The panel held that, in determining its Medical Loss Ratio under 42 U.S.C. § 300gg-18, the defendant insurer properly included as part of its payout the payments it made in settling a dispute with some of its enrollees, and there was no basis for excluding payments for services rendered by out-of-network physicians.

---

[*] The Honorable Thomas J. Whelan, United States District Judge for the Southern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jay Angoff (argued) and Christine H. Monahan, Mehri & Skalet PLLC, Washington, D.C.; Dan Stormer, Randy Renick, and Cornelia Dai, Hadsell Stormer & Renick LLP, Pasadena, California; for Plaintiffs-Appellants.

Gregory N. Pimstone (argued), Craig S. Bloomgarden, and Joanna S. McCallum, Manatt, Phelps & Phillips, LLP, Los Angeles, California; Michael S. Kolber, Manatt, Phelps & Phillips, LLP, New York, New York; for Defendant-Appellee California Physicians' Service.

**OPINION**

SCHROEDER, Circuit Judge:

In this appeal, Plaintiffs-Appellants contend that their insurer, Blue Shield of California ("Blue Shield"), violated an integral provision of the Patient Protection and Affordable Care Act ("ACA"), the Medical Loss Ratio ("MLR"), 42 U.S.C. § 300gg-18, a provision that has not yet been interpreted by our Court or our sister circuits. The MLR is the ratio between what an insurer pays out in claims for medical services and the revenue it takes in. *Id*. § 300gg-18(a). The insurer must pay a rebate to enrollees if the payout is less than 80% of the revenue. *Id*. § 300gg-18(b)(1). Plaintiffs in this case, enrollees seeking a larger rebate, argued that Blue Shield improperly included as part of its payout the payments it made in settling a dispute with some of its enrollees. The district court dismissed Plaintiffs' action, ruling that pursuant to the settlement, the

payments had been made, whether earlier disputed or not, and were therefore properly included.  We affirm.

## INTRODUCTION

### A.  The Medical Loss Ratio ("MLR") Defined

Congress enacted the ACA in 2010 to decrease the cost of health care and increase the number of Americans with health insurance.  *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).  The MLR plays a key role in furthering Congress' plan to decrease health care costs by requiring health insurance companies to spend at least 80 percent of their premium income on health care claims and health quality improvement.  42 U.S.C. § 300gg-18(a), (b).  Health insurance companies that do not meet the 80 percent spending requirement must refund to their enrollees the difference between the amount actually spent and the 80 percent figure. *Id*. § 300gg-18(b)(1).  For example, if a health insurance company has spent only 70 percent of premiums on clinical services and health improvements, its enrollees are entitled to a 10 percent rebate of premium revenue.  This rule is intended to ensure that spending is focused on health care expenses, as opposed to administrative costs such as salaries or marketing.  *Id*. § 300gg-18(b)(2);  45  C.F.R. § 158.140(b)(3)(iii).

The statute spells out the enforcement scheme.  Health insurance companies must calculate and annually report their MLR to the Department of Health and Human Services (HHS), the agency tasked with enforcing the provision. 42 U.S.C. § 300gg-18(a).  The instructions for calculating the ratio are provided under the MLR provision of the ACA and further explained in federal regulations.  The statute defines

the MLR as "the ratio of the incurred loss (or incurred claims) plus the loss adjustment expense (or change in contract reserves) to earned premiums." *Id*. The MLR regulations define "incurred claims" to include payments made by an issuer for "clinical services" and to exclude administrative expenses or work unrelated to clinical services. 45 C.F.R. § 158.140(a), (b)(3)(iii). Thus, the MLR compares what the health insurance company has spent on clinical services to the premium revenue the insurance company received from its enrollees. The statute requires a rebate when reported amounts paid out for actual clinical and related services are less than 80% of reported premium revenue. It thereby encourages insurers to use premium revenue to reimburse the costs of enrollees' medical treatment rather than to use it on administrative expenses. Indeed, the statutory section containing the MLR is entitled "Bringing down the cost of health care coverage." 42 U.S.C. § 300gg-18.

## B.  This Dispute

Blue Shield was selected by the State of California in 2010 to provide affordable health care plans on the state's health insurance exchange, "Covered California." Under Blue Shield's plans, "participating" or "in-network" providers accepted Blue Shield Covered California patients and charged for medical services at Blue Shield's participating provider benefit level. "Out-of-network" providers billed for medical services at higher rates than the in-network participating provider benefit level.

Shortly after Blue Shield was selected as an insurance company on California's health insurance exchange, however, enrollees who had purchased Blue Shield Covered California plans began complaining of difficulty finding in-

network providers charging in-network rates. The enrollee complaints led to the discovery that Blue Shield had erroneously listed out-of-network physicians in its network directory who had not in fact agreed to accept Blue Shield Covered California patients. As a result of Blue Shield's network directory mistake, some enrollees were charged the higher, out-of-network rates for medical services they received. To remedy the problem, Blue Shield executed a settlement agreement to reprocess the out-of-network claims at in-network rates, and to reimburse enrollees for the extra money they were charged on account of using an out-of-network provider. Blue Shield then included these settlement payments in the numerator of the MLR as "incurred claims," or payments for clinical services. According to the settlement agreement, Blue Shield reimbursements already totaled more than 35 million dollars.

Two Blue Shield enrollees, Becky Ebenkamp and Rebecca Morris, on behalf of a class of more than 446,000 enrollees ("Plaintiffs"), filed an action in Los Angeles County Superior Court in 2016, alleging Blue Shield violated the ACA by including the settlement payments in the MLR numerator. The named plaintiffs are Blue Shield enrollees who had received a MLR rebate for 2014, but they asserted that Blue Shield's settlement payments improperly inflated Blue Shield's MLR, thereby unfairly decreasing their rebate. In Plaintiffs' view, under the terms of the statute and of the settlement agreement, Blue Shield should have included in the MLR numerator only reimbursements for services provided by in-network providers. Plaintiffs asserted that including the payments for services rendered by providers outside those in the policy's network violated the federal statute and regulations and resulted in the insurer's having

been unjustly enriched through unfair competition. This allegedly entitled Plaintiffs to damages under state law.

Blue Shield timely removed the case to the Central District of California and filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court reviewed the MLR statute, regulations, and the settlement agreement. It concluded that the settlement payments compensated enrollees for clinical services covered by their policies, regardless of whether the providers who furnished the services were outside of Blue Shield's network. The district court reasoned that because the payments compensated enrollees for clinical services, Blue Shield correctly included those payments under the MLR numerator as "incurred claims." We affirm the district court's judgment of dismissal.

Plaintiffs are understandably desirous of receiving a larger rebate, but the MLR is an integral part of the ACA's intended purpose to broaden access to health care and decrease health care costs. The purpose of the MLR is thus to encourage use of premium income to provide benefits to insureds and discourage its use to offset administrative costs, thus serving the primary goal of expanding affordable care. *See* 42 U.S.C. § 300gg-18(b)(2); *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015). The statute does not make a distinction between in-network and out-of-network providers. We must conclude that the MLR can act as an effective incentive to insurers to provide benefits only if disputes are discouraged and all benefit payments are included in the ratio, whether they go to providers in-network or out-of-network.

This is best illustrated by looking to the history of the ACA and how its key provisions relevant to this dispute are

designed to operate. We therefore turn first to the statute itself.

## STATUTORY BACKGROUND

The ACA was enacted in 2010 after "a long history of failed health insurance reform." *See King*, 135 S. Ct. at 2485. Past experiences in many states had led to what the Supreme Court termed "an economic 'death spiral.'" *Id*. at 2486. As the price of premiums increased, the number of people purchasing health insurance dropped dramatically. *Id*.

The outcome was very different in Massachusetts, however, and Congress turned to it as a model. *Id*. Adopting some of the key reforms that made the Massachusetts insurance system successful, the ACA represented the most significant regulatory overhaul and national expansion of health care coverage since Medicare and Medicaid in 1965. *See id*.; *see also Sebelius*, 567 U.S. at 538–39, 541. The ACA was signed into law in 2010, and many of its private health insurance provisions went into effect in 2014. *See, e.g.*, 42 U.S.C. §§ 18022(c)(1), 18041(c)(1); *see King*, 135 S. Ct. at 2487; *Sebelius*, 567 U.S. at 538. As the Supreme Court emphasized, its purpose is to provide affordable, quality health insurance for all Americans and decrease the cost of health care. *Sebelius*, 567 U.S. at 538.

Composed of ten titles spanning over 900 pages and hundreds of provisions, the ACA brought sweeping reforms to our health care system. *Id.* at 538–39. Under the ACA, health insurance companies must accept every individual who applies for coverage. 42 U.S.C. § 300gg-1(a). These insurers are prohibited from charging higher premiums based on the condition of an applicant's health. *See id*. § 300gg(a).

To facilitate the purchasing of affordable health plans, the ACA created government-regulated health insurance "exchanges." *Id*. § 18031(b)(1). Exchanges are essentially online marketplaces where people can shop for insurance. *King*, 135 S. Ct. at 2487. The ACA directs each state to establish an exchange. 42 U.S.C. § 18031(b)(1). If a state decides not to establish an exchange, the ACA provides that the exchange shall be established and operated by the Secretary of Health and Human Services. *Id*. § 18041(c)(1). Further, the federal government has published a website (http://www.healthcare.gov) that explains the ACA to individual health insurance consumers and provides instructions on how to obtain coverage.

While policymakers continue to debate the ACA's future, there is research demonstrating that coverage expansion has particularly benefitted two historically vulnerable populations — low-income adults and those with chronic conditions. Benjamin D. Sommers, Bethany Maylone, Robert J. Blendon, E. John Orav, and Arnold M. Epstein, *Three-Year Impacts of the Affordable Care Act: Improved Medical Care and Health Among Low-Income Adults*, 36 Health Affairs 1119 (2017). According to at least one report, the number of uninsured Americans under the age of 65 has decreased from 44 million in 2013 to less than 27 million at the end of 2016. *Key Facts About the Uninsured Population*, Henry J Kaiser Family Foundation (Dec. 7, 2018), https://www.kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/.

As we have seen, this appeal concerns an important provision of the ACA commonly referred to as the Medical Loss Ratio or "MLR." 42 U.S.C. § 300gg-18(a). Although the basic formula for calculating the MLR ratio is defined by the ACA and federal regulations, the parties here dispute how

the ratio should be calculated in this case. The Centers for Medicare & Medicaid Services (CMS), a division within HHS, promulgated the standards for MLR calculation and reporting. 45 C.F.R. § 158.120. CMS requires a health insurer to submit, for each state in which it provides coverage, data on the aggregate premiums, claims experience, quality improvement expenditures, and non-claims costs it incurs in connection with the policies it issues. *See id*. §§ 158.120, 158.150, 150.160. The MLR report must detail the issuer's spending on medical benefits, including clinical services and activities that improve health care, compared to the revenue the issuer receives from enrollees. 42 U.S.C. § 300gg-18(a). The required reporting does not distinguish between in-network and out-of-network providers.

The applicable regulations explain the MLR is to act as an incentive to provide medical services and reduce administrative costs. 45 C.F.R. § 158.140(b)(3)(iii). The MLR is thus intended to further the ACA's goal of decreasing health care costs by providing greater transparency on how consumers' premium dollars are used and incentivizing issuers to maximize spending on health care and activities that improve health care quality, thereby promoting greater efficiency in health insurance markets. Medical Loss Ratio Requirements Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 28,790, 28,791, 28,793 (May 16, 2012). HHS has further explained that the MLR is intended to ensure that "policyholders receive value for their premium dollars" because the higher the MLR, the more value a policyholder receives for each premium dollar. Health Insurance Issuers Implementing Medical Loss Ratio (MLR) Requirements Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 74864-01, 74865 (Dec. 1, 2010). The purpose of the ACA, as demonstrated by the content of its

provisions and the implementing regulations, as well as its history, is to broaden access to health care. This strongly indicates that the ACA should be interpreted and applied in a manner that encourages insurers to spend premium revenue on medical services.

## FACTUAL BACKGROUND

This dispute began when consumers purchased Blue Shield insurance plans through the State of California's health insurance exchange. The ACA established health insurance exchanges in all 50 states. The exchanges are regulated, online marketplaces administered by either the federal or state government, where individuals and small businesses can purchase affordable, private health insurance plans. These exchanges commenced operation on October 1, 2013, with health insurance coverage beginning on January 1, 2014.

To implement the ACA's requirements, California created a state-run health exchange, known as Covered California. It selected Blue Shield as one of the insurance companies to offer health care plans on the Covered California marketplace. Individuals who enrolled in a Blue Shield plan through Covered California were able to look up physicians accepting Covered California patients in an online directory posted on Blue Shield's website. Blue Shield Covered California enrollees could also select a doctor by calling Blue Shield's customer service representatives, who in turn shared participating provider information from the directory.

Shortly after the online Covered California marketplace went live in late 2013, the California Department of Managed Heath Care ("DMHC"), the state regulatory body that governs managed health care plans, began receiving

complaints from Covered California consumers who had signed up for a Blue Shield plan.  These enrollees reported difficulty finding in-network physicians.  In response, DMHC conducted an informal telephone survey of randomly selected providers that Blue Shield had identified as contracted physicians for the Blue Shield Covered California plans. During the course of this survey, several offices informed DMHC that they were not in fact accepting Covered California enrollees.

DMHC then began a formal survey of the entire Blue Shield provider directory.  On November 17, 2014, DHMC issued its final report which revealed that approximately nine percent of the physicians listed in the Blue Shield online provider directory were not accepting Covered California patients. Blue Shield acknowledged it had mistakenly listed out-of-network providers in its directory, and also acknowledged the confusion it caused among enrollees and providers.  To resolve the problem, Blue Shield agreed to update and correct the provider list and to reprocess out-of-network claims at in-network rates.  In October 2015, DMHC and Blue Shield executed a settlement agreement describing the provider directory mistake and outlining Blue Shield's obligations to remedy it.

Under Exhibit A of the settlement agreement, entitled "Corrective Action," Blue Shield agreed to adjust claims for enrollees who had paid out-of-network rates for services of providers mistakenly listed as in-network.  They were defined as enrollees who "paid a provider in excess of the amount they would have paid if the claim had been processed at the participating provider benefit level as a result of inaccuracies in its [p]rovider [d]irectory during the 2014 and 2015 benefit years."  To be reimbursed, enrollees were required to attest

that they received "covered services."   Paragraph six of Exhibit A describes the process that required enrollees to identify the specific services they received from a provider outside the network:

> The [Blue Shield] notice shall advise recipients that if they received covered services from a provider outside of their plan's network as a result of misinformation from Blue Shield regarding the provider's participation status, and paid the provider out of pocket for care, they may submit a written claims submission form to a designated address within 30 days to request reprocessing of the claim. The claims submission form shall require members to attest: a. that they received covered services from a specific provider who was represented in Blue Shield's Provider Directory or by Blue Shield as participating in the network. . . .

Enrollees were also required to list the date of their visit, and confirm that they paid the provider for the services at issue or that the provider was actively seeking payment.   The submission form included an explanation of benefits or claim number so that Blue Shield could identify and reprocess the disputed claim.  If an enrollee submitted all of the required information identified in paragraph six of Exhibit A, and Blue Shield confirmed that the provider directory mistake led to the claim or alternatively that the attestation was acceptable, Blue Shield was required to reprocess the claim at the participating provider benefit level.  Blue Shield paid over $38 million in claims adjustments to enrollees who had received clinical services from providers that did not accept

Covered California patients.  Blue Shield included the claims adjustments in the MLR report for 2014, but nevertheless fell short of the 80% requirement and paid rebates to enrollees. Plaintiffs in this case are Blue Shield enrollees who received a MLR rebate for 2014, but now claim they are entitled to a larger rebate because Blue Shield improperly included in the MLR the claim adjustments paid out under the settlement agreement.

## PROCEDURAL HISTORY

This case began in state court, because Plaintiffs claimed the alleged MLR miscalculation amounted to unfair competition and unjust enrichment under California law.  On July 1, 2016, Plaintiffs filed a class action in Los Angeles County Superior Court, alleging Blue Shield improperly included the settlement payments as "incurred claims" in the MLR numerator, so that enrollees did not receive the rebate they should have received.  Blue Shield removed the case to the Central District of California and moved to dismiss the complaint.  Rather than opposing the motion, Plaintiffs filed a First Amended Complaint ("FAC").  The FAC alleged the claim adjustments should not have been included in the MLR because they were restitution payments pursuant to the settlement agreement for payments to out-of-network providers and not to providers covered by the policy.

Blue Shield moved to dismiss Plaintiffs' FAC, arguing the restitution payments fall within the definition of "incurred claims" because they were for covered services, and that it did not matter for purposes of the MLR whether the providers were in or out-of-network.  Plaintiffs opposed the motion, asserting that because the providers were not in-network, the services were not covered under the policy, and therefore the

payments did not fall within the definition of "incurred claims" or payments for services "covered by the policy." 45 C.F.R. § 158.140(a). The district court granted Blue Shield's motion to dismiss without leave to amend. It concluded that because the settlement agreement provided reimbursement for services that were covered by the policy, these payments were properly included in the MLR numerator. The district court explained, "[a]lthough the providers were not covered by the policies, their services were." This appeal followed.

## DISCUSSION

The dispositive issue in this appeal is whether the MLR was properly calculated under federal law by including the settlement reimbursements for medical services by non-network providers. If there was no violation of the applicable federal law, we need not decide whether such an alleged violation could constitute a violation of California consumer protection laws.

Plaintiffs' position is that the reimbursements do not count because they were for services from out-of-network providers. We look first to the provisions of the statute to see if it supports such a distinction. It does not. The statute requires annual reporting of the ratio of claims reimbursements to premium revenue. 42 U.S.C. § 300gg-18(a). Reimbursements for clinical services must be included in the MLR numerator as "incurred claims." *Id*. § 300gg-18(a)(1). In relevant part it provides:

> (a) Clear accounting for costs
>
> A health insurance issuer offering group or individual health insurance coverage

(including a grandfathered health plan) shall, with respect to each plan year, submit to the Secretary a report concerning the ratio of the incurred loss (or incurred claims) plus the loss adjustment expense (or change in contract reserves) to earned premiums. Such report shall include the percentage of total premium revenue, after accounting for collections or receipts for risk adjustment and risk corridors and payments of reinsurance, that such coverage expends--

(1) *on reimbursement for clinical services provided to enrollees under such coverage;*

(2) for activities that improve health care quality; and

(3) on all other non-claims costs, including an explanation of the nature of such costs, and excluding Federal and State taxes and licensing or regulatory fees. . . .

*Id*. The critical statutory focus is on health insurers providing coverage for health services. The statute measures total expenditures on health services. *See id*. § 300gg-18(a)(1)–(3). For purposes of the statutory provisions, which the parties agree are controlling, the relative amounts required to be paid to in-network as opposed to out-of-network providers is irrelevant. Only the total matters.

Plaintiffs point out that the numerator's reimbursement for clinical services under the statute has some limitation, in that to be included in the numerator, the services must fall

within the policy's coverage.    The statute refers to reimbursement "for clinical services . . . under such coverage."  *Id*. § 300gg-18(a)(1).  This limitation, however, is on the nature of the services that qualify for inclusion, not on any characteristic or qualification of the provider.

Plaintiffs therefore go on to focus their argument on the text of the applicable regulations and specifically the definition of "incurred claims" to be included in the numerator.    These must include payments to providers "whose services are covered by the policy."    45 C.F.R. § 158.140(a).

> (a) General requirements. The report required in § 158.110 must include direct claims paid to or received by providers, including under capitation contracts with physicians, whose *services are covered by the policy* for clinical services or supplies covered by the policy. In addition, the report must include claim reserves associated with claims incurred during the MLR reporting year, the change in contract reserves, reserves for contingent benefits and the medical claim portion of lawsuits, and any incurred experience rating refunds. Reimbursement for clinical services, as defined in this section, is referred to as "incurred claims." All components of and adjustments to incurred claims, with the exception of contract reserves, must be calculated based on claims incurred only during the MLR reporting year and paid through March 31st of the following year.

> Contract reserves must be calculated as of
> December 31st of the applicable year.

*Id*.  Plaintiffs contend that the condition that the services be covered by the policy means that the providers must be in-network.  Yet the regulation does not say that.  Like the statute, the regulation makes no distinction between in-network and out-of-network providers.

Nor does the settlement agreement assist Plaintiffs.  It is intended to compensate enrollees who paid out-of-network rates because Blue Shield mistakenly listed some providers as being in-network.  It does no more than establish that Blue Shield agreed to provide the compensation in satisfaction of claims, and to that extent, it supports Blue Shield's position that such amounts should be included in the MLR numerator.  The settlement agreement does not expressly refer to the MLR and in no way suggests that the settlement payments should be excluded from the MLR numerator.

We do not minimize the differences in the way various plans treat services performed by in-network as opposed to out-of-network providers.  Whether and to what extent a provider's services are covered depends on the type of insurance plan.  A government website is helpful in explaining the differences.  *Health Insurance Plan & Network Types: HMOs, PPOs, and More*, Healthcare.gov, https://www.healthcare.gov/choose-a-plan/plan-types/ (last visited February 4, 2019).  The insurance universe can be bewildering.  For the purposes of this case, however, none of the relevant documents or provisions of federal law contain any language that supports Plaintiffs' contention that the MLR numerator must exclude payments to out-of-network providers.

Nor would there be any point in straining the language in the manner Plaintiffs suggest in order to narrow the definition of claims that should be included.  This is because the purpose of the ACA was to broaden access to healthcare and reduce costs.  The MLR was enacted to further that purpose by incentivizing insurers to pay for health services.  The more the percentage of premium income paid out in benefits falls below 80%, the greater the rebate the insurer must pay to the enrollees.

Congress passed the ACA to expand health insurance coverage. *See King*, 135 S. Ct. at 2485, 2493.  The MLR 80 percent spending requirement on incurred claims furthers this goal by encouraging health insurance companies to pay for clinical services.  Should that spending requirement on clinical services not be met, the MLR rebate serves the ACA's twin goal of lowering health care costs by reimbursing to consumers some of the premium money paid to the health insurance company. *See Sebelius*, 567 U.S. at 538; 42 U.S.C. § 300gg-18.  The 80 percent spending requirement on incurred claims and the rebate work together to create an incentive for health insurance companies to maximize the amount of money spent on health care and activities that promote health care. *See* Medical Loss Ratio Requirements Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 28,790, 28,791, 28,793 (May 16, 2012).

Thus, Congress was quite clearly concerned with expanding benefits and reducing costs.  The MLR is inclusively defined with respect to payouts and contains an express exclusion for administrative costs.  The structure is meant to encourage insurers to pay benefits and to discourage disputes.  Plaintiffs ask us to turn the system on its head by

essentially contending that the goal should be to provide rebates to enrollees rather than insurance benefits. Insureds pay premiums in order to be eligible for reimbursement of health care costs, not for rebates. Plaintiffs seek to draw a type of distinction that would discourage the payment of benefits and encourage costly disputes like the one that is at the root of this case.

For all of these reasons, we conclude there is no basis in the language, history, intent or spirit of the ACA to narrow the MLR by excluding payments for services rendered by out-of-network physicians. As the district court correctly recognized, the services were covered by the plan and the payments were made.

The district court did not err in dismissing the action without leave to amend because Plaintiffs never asked for leave to amend the complaint. *See Alaska v. United States*, 201 F.3d 1154, 1163 (9th Cir. 2000). Plaintiffs belatedly ask us to remand so that they may amend the complaint to claim that some of the reimbursements were for services outside the plan. The request is untimely. *See id*. at 1163–64. It is also inconsistent with the history of the underlying dispute. Plaintiffs have never asserted that the services for which reimbursement was made were not covered by the plan. This dispute has always been over the increased costs of out-of-network providers rendering covered services, and that is the dispute the settlement agreement resolved. Plaintiffs chose to litigate how that resolution should be treated in the MLR, and can not now go back and try to change the terms of the settlement itself. Those terms were clear: Blue Shield agreed to reprocess claims for clinical services at in-network rates only if the enrollee submitted a written form attesting he or she received covered services from a provider who was

erroneously listed in the Blue Shield provider directory. Enrollees were not eligible for a claims adjustment if the services they received were not covered by their plan. Thus, the settlement agreement sought to remedy the provider directory mistake as to the cost of covered services. There is no valid reason to reopen it.

The district court's judgment of dismissal must be affirmed.

**AFFIRMED**.