IN THE SUPREME COURT OF NORTH CAROLINA

No. 142A12

Filed 22 May 2026

STATE OF NORTH CAROLINA

v.

WILLIAM EUGENE ROBINSON

Appeal pursuant to N.C.G.S. § 7A-27(a)(1) from a judgment imposing a sentence of death entered on 9 December 2011 in Superior Court, Stanly County, upon a jury verdict finding defendant guilty of first-degree murder. On 28 May 2025, the Supreme Court entered a special order directing the parties to brief two questions presented since Governor Roy Cooper commuted defendant's death sentence on 31 December 2024. This matter was calendared for argument in the Supreme Court on 30 October 2025 but determined on the briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jeff Jackson, Attorney General, by Caden William Hayes, Assistant Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Katy Dickinson-Schultz and John F. Carella, Assistant Appellate Defenders, for defendant-appellant.*

ALLEN, Justice.

Direct appeals from final judgments in felony cases typically go from the superior court to the Court of Appeals with the possibility of further review by this Court. *See* N.C.G.S. § 7A-27(b)(1) (2025). Defendant William Eugene Robinson's

appeal is before this Court pursuant to N.C.G.S. § 7A-27(a)(1), which gives defendants who have received death sentences for first-degree murder the right to appeal directly to the Supreme Court of North Carolina. *See* N.C.G.S. § 7A-27(a)(1) (2025). We must decide whether defendant lost his right of direct appeal to this Court under N.C.G.S. § 7A-27(a)(1) when then-Governor Roy Cooper commuted his death sentence to life imprisonment without parole. As explained below, we conclude that the General Assembly created direct appeals to this Court in death penalty cases to guard against arbitrary or unjust executions. Because defendant no longer faces the prospect of execution, affording him a direct appeal in this case would contravene legislative intent. We therefore remand this case to the Court of Appeals for appellate review.

I.

On 12 March 2007, defendant was indicted for the first-degree murder of Keith Crump.[1] Additional indictments charged him with assault, robbery, and attempted murder.

Defendant filed a pre-trial motion under the Racial Justice Act (RJA) to

---

[1] No record on appeal has been filed in this case due to this Court's order of 12 April 2012 staying appellate proceedings. Consequently, the background information in this opinion comes largely from defendant's principal brief to this Court. The State did not contest defendant's description of the relevant facts or procedural history. *See* N.C. R. App. P. 28(c) (providing that an appellee's brief "does not need to contain a statement of the . . . procedural history of the case . . . [or] . . . the facts . . . unless the appellee disagrees with the appellant's statements and desires to make a restatement").

prohibit the imposition of the death penalty.[2] The case was nonetheless declared capital. Defendant and the State agreed that the trial court did not have to hear defendant's RJA claim prior to trial, and the trial court entered a consent order memorializing the parties' agreement.

On 1 December 2011, the jury found defendant guilty of larceny of a firearm, possession of firearm by a felon, two counts of robbery with a dangerous weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree murder, and first-degree murder. Thereafter the court conducted a capital sentencing hearing, and the jury recommended the death penalty for the murder of Mr. Crump. The trial court sentenced defendant to death for the first-degree murder conviction and to active, consecutive prison terms for the other convictions. Defendant appealed.

On 4 April 2012, defendant filed amended RJA motions in this Court and in the trial court. That same day, he moved this Court to stay all appellate proceedings pending the disposition of his RJA motions. On 12 April 2012, this Court allowed the motion to stay.

During the pendency of his appeal, defendant applied to then-Governor Roy Cooper for clemency. On 31 December 2024, Governor Cooper issued an order

---

[2] Enacted in 2009, the RJA established postconviction procedures through which death row defendants could challenge their death sentences as having been imposed on the basis of race. *See* North Carolina Racial Justice Act, S.L. 2009-464, 2009 N.C. Sess. Laws 1213. The General Assembly repealed the RJA in 2013. Act of June 13, 2013, S.L. 2013-154, § 5.(a), 2013 N.C. Sess. Laws 368, 372.

commuting defendant's death sentence to life imprisonment without parole.

On 19 May 2025, defendant moved this Court to dissolve the stay and remand this case to the Court of Appeals, arguing that the commutation of his death sentence transformed this matter into a non-capital appeal that should be reviewed by the Court of Appeals. The State did not file a response to the motion.

On 28 May 2025, this Court entered a special order directing the parties to brief the following questions:

> 1. When the Governor commutes a defendant's death sentence to life imprisonment but no court has vacated, altered, or amended the judgment that includes a sentence of death, does initial appellate jurisdiction now rest with the Court of Appeals under N.C.G.S. § 7A-27?
>
> 2. When a defendant is convicted of murder in the first degree together with other offenses in the same criminal trial and the court enters multiple judgments following a single sentencing, one of which includes a sentence of death, does initial appellate jurisdiction over any judgments that do not include a sentence of death rest with the Court of Appeals under N.C.G.S. § 7A-27, including whether, for purposes of N.C.G.S. § 7A-27, all of a defendant's judgments in this circumstance together form a single "case" in which a judgment of the superior court includes a sentence of death[?]

## II.

Under subsection 7A-27(a)(1), an "[a]ppeal lies of right directly to the Supreme Court in . . . [a]ll cases in which the defendant is convicted of murder in the first degree and the judgment of the superior court includes a sentence of death." N.C.G.S.

§ 7A-27(a)(1). Defendant argues that N.C.G.S. § 7A-27(a)(1) no longer applies to his appeal following the Governor's commutation of his death sentence. He requests that we "dissolve the stay in this matter and remand [this] case to the Court of Appeals for further proceedings as a non-capital direct appeal."

In support of this position, defendant argues that N.C.G.S. § 7A-27(a)(1) must be construed alongside N.C.G.S. § 15A-2000(d). He contends that the text and legislative history of N.C.G.S. § 7A-27(a)(1) and N.C.G.S. § 15A-2000(d) "all point to the same conclusion: [defendant's] appeal should begin in the Court of Appeals."

Subsection (d) of N.C.G.S. § 15A-2000 provides that "[t]he judgment of conviction and sentence of death is subject to automatic review by the Supreme Court of North Carolina pursuant to procedures established by the Rules of Appellate Procedure." N.C.G.S. § 15A-2000(d)(1) (2025). While both N.C.G.S. § 7A-27(a)(1) and N.C.G.S. § 15A-2000(d) create a right of appeal directly to this Court for defendants under sentences of death, subsection 15A-2000(d) makes the appeal automatic.

Subsection 15A-2000(d) further directs this Court to "consider the punishment as well as any arguments raised on appeal" and to overturn a death sentence and instead impose a life sentence

> upon a finding that the record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, or upon a finding that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, or upon a finding that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and

the defendant.

*Id.* § 15A-2000(d)(1)–(2) (2025).

Defendant notes that our General Assembly enacted N.C.G.S. § 15A-2000(d) just a few months after the Supreme Court of the United States issued its decision in *Gregg v. Georgia*, 428 U.S. 153 (1976), upholding Georgia's appeal procedures for death penalty cases. *See* An Act to Establish Procedures for Sentencing in Capital Cases and to Fix the Punishment for Murder, ch. 406, 1977 N.C. Sess. Laws 407. Like N.C.G.S. § 15A-2000(d), the Georgia law "provide[d] for automatic appeal of all death sentences to the State's Supreme Court." *Gregg*, 428 U.S. at 198. It also required the Georgia Supreme Court to determine whether each death sentence "was imposed under the influence of passion or prejudice, whether the evidence support[ed] the jury's finding of a statutory aggravating circumstance, and whether the sentence [was] disproportionate compared to those sentences imposed in similar cases." *Id.*

According to defendant, when N.C.G.S. § 7A-27(a)(1) and N.C.G.S. § 15A-2000(d) are considered together, it becomes clear that "[t]he elimination of [defendant's] death sentence removed every justification for automatic review, because questions of aggravating and mitigating factors, improper influence over the jury's decision to reach a death verdict, and the proportionality of the death sentence have become moot." "What remains," defendant insists, "is an ordinary direct appeal from a criminal conviction." To interpret N.C.G.S. § 7A-27(a)(1) to allow an appeal of right to this Court in these circumstances "would lead to an absurd

result."

Defendant further observes that, prior to 1995, N.C.G.S. § 7A-27(a) granted an appeal of right not just to defendants convicted of first-degree murder and sentenced to death but also to defendants convicted of first-degree murder and sentenced to life imprisonment. *See* An Act to Provide for the Court of Appeals to Hear Certain Appeals in Which Life Sentences are Imposed, ch. 204, 1995 N.C. Sess. Laws 389. Over the thirty-year period since the General Assembly eliminated an appeal of right to this Court for defendants sentenced to life imprisonment for first-degree murder, defendant maintains, "[a] sentence of death has remained the defining feature of this Court's jurisdiction over direct appeals from Superior Court judgments in criminal cases."

The State argues that the Governor's exercise of clemency has no impact on defendant's right of appeal under N.C.G.S. § 7A-27(a)(1). For one thing, the State asserts, the "plain language" of N.C.G.S. § 7A-27(a)(1) "dictates that an appeal from a capital 'judgment of the superior court'—such as [d]efendant's here—flows directly to this Court." For another, N.C.G.S. § 7A-27(a)(1) makes no reference to N.C.G.S. § 15A-2000(d). Moreover, the State describes defendant's reliance on legislative history as "misplaced" because this Court disfavors the use of such history when the text of a statute is unambiguous.

The State likewise discerns no merit in defendant's "absurdity" argument. It contends that the courts rarely refuse to follow the plain language of a statute out of

concern that doing so would produce absurd results. According to the State, "[d]efendant has not shown how the application of N.C.G.S. § 7A-27(a)(1) to a recipient of clemency is the 'rare' situation where absurdity overrides the General Assembly's plain language."

### III.

"The intent of the legislature controls the interpretation of a statute." *Mazda Motors of Am., Inc. v. Sw. Motors, Inc.*, 296 N.C. 357, 361 (1979). "When construing a statute, we first examine the plain words of the statute, as the best indicia of legislative intent is the language of the statute itself." *Wynn v. Frederick*, 385 N.C. 576, 581 (2023) (cleaned up).

"If the language of a statute is clear, the court must implement the statute according to the plain meaning of its terms so long as it is reasonable to do so." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001). The plain meaning rule is a foundational principle of statutory construction. Consistent with the separation of powers, it prevents the courts from rewriting unambiguous statutes to reach judicially preferred outcomes contrary to what the legislature wished to achieve.

On the other hand, the plain meaning rule does not mandate a crudely literal approach to reading statutes. As this Court recently remarked, "[t]extual interpretation seeks to give statutes their plain and ordinary meaning. Literalism is not proper textual analysis; we must reject readings that defy our common sense." *Happel v. Guilford Cnty. Bd. of Educ.*, 387 N.C. 186, 206 (2025). Similarly, our

precedents require us to reject literal statutory readings that contravene the "manifest purpose of the [l]egislature" and "the reason and purpose of the law." *State v. Barksdale*, 181 N.C. 621, 625 (1921). Thus, the plain meaning rule cannot be invoked to justify decisions that are patently unreasonable or incompatible with the legislative intent evident from the statutory context. *See generally Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

According to the State, the legislature's use of the phrase "and the judgment of the superior court includes a sentence of death" in N.C.G.S. § 7A-27(a)(1) permits only one conclusion: if the judgment of the trial court includes a death sentence for first-degree murder, the defendant has an appeal of right to this Court, period. Any act of clemency by the Governor has no bearing on the matter.

Of course, we asked for briefing on this question precisely because N.C.G.S. § 7A-27(a)(1) says nothing whatsoever about the impact of executive clemency on a defendant's right of direct appeal to this Court. Granted, one could infer from the omission that the General Assembly did not mean for clemency to have any effect on a direct appeal to this Court in a death penalty case. It is just as plausible, however, that the legislature saw no need to address the impact of executive clemency on an appeal under N.C.G.S. § 7A-27(a)(1) because governors so rarely grant clemency during the direct appeal phase of capital litigation. *See Bacon*

*v. Lee*, 353 N.C. 696, 708 (2001) ("[T]he executive in North Carolina does not ordinarily consider clemency requests in capital cases until the applicant has exhausted all avenues of relief within the federal and state judiciary.").

Given the relative infrequency of clemency in capital cases on direct appeal, defendants who have been sentenced to death will almost always remain subject to active death sentences as their direct appeals work their way through the courts. Consequently, the General Assembly could have regarded the phrase "and the judgment of the superior court includes a sentence of death" in N.C.G.S. § 7A-27(a)(1) as merely a formal way of referring to an active death sentence.

Yet we need not tie ourselves in knots speculating about whether the General Assembly intended to create a direct appeal to this Court for defendants whose death sentences have been commuted by the Governor. The provisions of N.C.G.S. § 15A-2000(d) illuminate the legislature's "reason and purpose" sufficiently to enable us to answer the question.[3] *Barksdale*, 181 N.C. at 625.

On its face, subsection 15A-2000(d)—like N.C.G.S. § 7A-27(a)(1)—expressly

---

[3] The dissent would have us ignore N.C.G.S. § 15A-2000(d) and read N.C.G.S. § 7A-27(a)(1) in a vacuum. Inasmuch as N.C.G.S. § 15A-2000(d) directly concerns the very matter at issue—the right of direct appeal to this Court in capital cases—we do not consider ourselves free to disregard what it tells us about legislative intent. *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012) ("Any word or phrase that comes before a court for interpretation is part of a whole statute, and its meaning is therefore affected by other provisions of the same statute. It is also . . . part of an entire *corpus juris*. So, if possible, it should no more be interpreted to clash with the rest of that corpus than it should be interpreted to clash with other provisions of the same law. Hence laws dealing with the same subject . . . should . . . be interpreted harmoniously").

creates an appeal of right to this Court when a defendant has been sentenced to death. N.C.G.S. § 15A-2000(d)(1). Specifically, subsection 15A-2000(d) requires "automatic review" by this Court of "[t]he judgment of conviction and sentence of death . . . pursuant to procedures established by the Rules of Appellate Procedure." *Id.*[4]

Unlike N.C.G.S. § 7A-27(a)(1), subsection 15A-2000(d) delineates the parameters of our review of direct appeals in death penalty cases. We must "consider the punishment imposed as well as any arguments raised on appeal." *Id.* And as noted previously, we must overturn a defendant's death sentence and instead impose life imprisonment if we find that: (1) the record does not support any aggravating circumstances or any circumstances on which the court based the death sentence; (2) passion, prejudice, or any other arbitrary factor influenced the decision to impose the death sentence; or (3) the death sentence is excessive or disproportionate as compared to the penalty imposed in similar cases, taking into account the crime and the defendant. N.C.G.S. § 15A-2000(d)(2). Finally, this Court must order a new sentencing hearing if it reverses "the sentence of death and the judgment of the trial court" because of an error made during the sentencing phase of a defendant's trial. N.C.G.S. § 15A-2000(d)(3) (2025).

---

[4] Subsection 15A-2000(d) also directs this Court to conduct its review "within 24 months of entry of judgment unless the Chief Justice of the Supreme Court makes a written finding of extraordinary circumstances that provide good cause for delay." N.C.G.S. § 15A-2000(d).

Viewed as a whole, the provisions of N.C.G.S. § 15A-2000(d) unmistakably reveal the legislature's principal concern in creating direct appeals to this Court from judgments imposing the death penalty: to prevent arbitrary or unjust executions. Our view of the text is reinforced by the fact that the General Assembly obviously enacted N.C.G.S. § 15A-2000(d) in response to the Supreme Court's *Gregg* decision. On the same day that it issued *Gregg*, the Supreme Court struck down a North Carolina law that had mandated the death penalty for all first-degree murder convictions. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The similarities between N.C.G.S. § 15A-2000(d) and the statutory scheme upheld in *Gregg* indicate that the General Assembly was anxious to adopt constitutionally adequate appeal procedures for death penalty cases.

Here the Governor's commutation of defendant's death sentence has eliminated any risk that the State will arbitrarily or unjustly execute defendant for the murder of Mr. Crump. Thus, allowing defendant to continue pursuing a direct appeal to this Court would do nothing to advance the legislative intent evident in N.C.G.S. § 15A-2000(d). Moreover, defendant has already obtained the primary relief available under N.C.G.S. § 15A-2000(d), namely, the substitution of life imprisonment for the death penalty. We do not believe that the legislature meant for this Court to conduct the review specified in N.C.G.S. § 15A-2000(d) when doing so would serve no practical purpose.

Likewise the legislative history of N.C.G.S. § 7A-27(a)(1) provides good reason

to doubt that the General Assembly intended the provision to create direct appeals to this Court for defendants who are not subject to active death sentences. As defendant notes in his brief, the original version of N.C.G.S. § 7A-27(a) expressly allowed a direct appeal to this Court "[f]rom any judgment of a superior court which includes a sentence of death *or imprisonment for life.*" N.C.G.S. § 7A-27(a) (1969) (emphasis added).[5] In 1995 the General Assembly deleted the words "or imprisonment for life" from N.C.G.S. § 7A-27(a). *See* An Act to Provide for the Court of Appeals to Hear Certain Appeals in Which Life Sentences are Imposed, ch. 204, 1995 N.C. Sess. Laws 389.

Clearly the legislature adopted the 1995 amendment to eliminate direct appeals to this Court for defendants who are not in jeopardy of being executed. In arguing that defendant still has an appeal of right to this Court even though his maximum punishment is now life imprisonment, the State urges this Court to adopt a position that seems squarely at odds with what the legislature wanted the 1995 amendment to accomplish.

In contrast a remand of this case to the Court of Appeals appears entirely consistent with the legislative intent behind N.C.G.S. § 7A-27(b)(1), the provision granting the Court of Appeals jurisdiction over most direct appeals from the final

---

[5] In 1987 the legislature amended N.C.G.S. § 7A-27(a) to specify that the provision applies to defendants convicted of first-degree murder. An Act to Provide for the Court of Appeals to Hear Certain Appeals in Which Life Sentences are Imposed, ch. 679, § 1, 1987 N.C. Sess. Laws 1259, 1259.

judgments of superior courts. Under subsection 7A-27(b)(1), a defendant sentenced to life imprisonment without parole for first-degree murder has a right of direct appeal to the Court of Appeals, not to this Court. N.C.G.S. § 7A-27(b)(1). Thus, in remanding this case to the Court of Appeals, we will be putting defendant in the same boat as other defendants whose maximum punishment for first-degree murder is life imprisonment without parole. In addition to aligning with the legislature's rationale for enacting N.C.G.S. §§ 7A-27(a)(1) and 15A-2000(d), this outcome also has the virtue of being fair.

For the reasons discussed above, we hold that the Governor's commutation of defendant's death sentence to life imprisonment without parole foreclosed defendant's appeal of right to this Court under both N.C.G.S. § 7A-27(a)(1) and N.C.G.S. § 15A-2000(d). Accordingly, jurisdiction over defendant's appeal lies with the Court of Appeals as provided by N.C.G.S. § 7A-27(b)(1). In light of our holding, it is unnecessary for us to reach the second issue set out in our special order of 28 May 2025.

## IV.

We allow defendant's motion to dissolve the stay entered on 12 April 2012 and remand this case to the Court of Appeals for review of defendant's appeal pursuant to N.C.G.S. § 7A-27(b)(1).

REMANDED.

Justice BERGER dissenting.

The majority has articulated a number of reasonable policy considerations to arrive at presumed legislative intent to justify its preferred result here. But as Justice Scalia notably remarked, "when the text of a statute is clear, that is the end of the matter." Antonin Scalia, *A Matter of Interpretation* 16 (Amy Gutmann ed., 1997). Indeed, our recent case law reflects that bedrock principle of textualism: "If the plain language of the statute is unambiguous, we apply the statute as written." *Wynn v. Frederick*, 385 N.C. 576, 581 (2023) (cleaned up).[1]

The jurisdictional directive in N.C.G.S. § 7A-27(a)(1) is clear and unambiguous. An "[a]ppeal lies of right directly to the Supreme Court in . . . [*a*]*ll* cases in which the defendant is convicted of murder in the first degree and the judgment of the superior court includes a sentence of death." N.C.G.S. § 7A-27(a)(1) (2025) (emphasis added). "Could anyone maintain with a straight face that [this statute] is unclear?" *King v. Burwell*, 576 U.S. 473, 510 (2015) (Scalia, J., dissenting). " 'All' means all and not substantially all." *Nat'l Steel & Shipbuilding Co. v. United States*, 419 F.2d 863, 875 (Ct. Cl. 1969). Full stop. There is no ambiguity here, and the legislative intent is

---

[1] *See also N.C. Farm Bureau Mut. Ins. Co. v. Hebert*, 385 N.C. 705, 711 (2024) ("If the statute's plain language is clear and unambiguous, this Court applies the statute as written and does not engage in further statutory construction."); *In re McClatchy Co.*, 386 N.C. 77, 86 (2024) (same); *State v. Applewhite*, 386 N.C. 431, 436 (2024) ("When the language of a statute expresses the legislative intent in clear and unambiguous terms, the words employed must be taken as the final expression of the meaning intended . . . ." (cleaned up)).

evident from the plain language of the statute: this Court receives direct appeals in "all cases" in which a defendant is convicted of first-degree murder and the judgment contains a sentence of death.

The majority correctly acknowledges that courts do not "rewrit[e] unambiguous statutes." Yet they rewrite that statute, apparently determining that "all" is ambiguous without bothering to tell us so. They seem to reason that because N.C.G.S. § 7A-27(a)(1) is silent about what should occur if clemency is granted, that gives this Court license to rewrite the statute to conform with what they think the legislature must have meant. That's not the way textualism works. *See Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 397 (1951) (Jackson, J., concurring) ("We do not inquire what the legislature meant; we ask only what the statute means." (cleaned up)); *Lunsford v. Mills*, 367 N.C. 618, 623 (2014) ("[I]t is our duty to give effect to the words actually used in a statute and not to delete words used or to insert words not used."). Again, all means all, not some lesser portion.

In addition, the majority's analysis of the clemency power and its effect on the judicial branch is noticeably absent. Although they mention separation of powers, they fail to address the constitutional implications of executive clemency on judicial proceedings. The effect of this opinion, however, is a blurring of clear lines.

Article III, § 5(6) of the Constitution of North Carolina vests clemency decisions exclusively with the Governor, and this power is "an Executive Branch function separate from adjudicatory proceedings within the Judicial Branch." *Bacon v. Lee*,

353 N.C. 696, 704 (2001). "[T]he power to determine guilt and to assess punishment for crime are functions of the courts, whereas the power of [clemency] is vested exclusively in . . . the executive branch." *State v. Conner*, 241 N.C. 468, 469 (1955). *See also Bacon*, 353 N.C. at 706 ("[C]lemency proceedings are not part of the trial—or even the adjudicatory process. They do not determine the guilt or innocence of the defendant. . . . They are conducted by the executive branch, independent of direct appeal and collateral relief proceedings." (second alteration in original) (quoting *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 284 (1998))). "[T]he nature of clemency is inherently one of executive 'grace' or 'mercy[.]'" *Bacon*, 353 N.C. at 713.

Article IV of our Constitution establishes the "judicial power" exclusively in the courts. *See* N.C. Const. art. IV. This Court has held "providing relief from a judgment is a judicial act," and that "judicial power extends not only to entering judgments but also to providing relief from them." *Doe 1K v. Roman Cath. Diocese of Charlotte*, 387 N.C. 12, 16 (2025). Executive actions such as parole, clemency, and commutation are unrelated to judicial proceedings. *See Conner*, 241 N.C. at 469–70.

The Separation of Powers Clause in our state constitution provides the "legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. It is axiomatic then that the executive cannot wield judicial authority and the clemency power does not alter the judgment entered herein because it constitutionally cannot. Put another way, the clemency power is an executive function wholly separate and distinct from

the constitutionally committed judicial function of entering judgments in criminal cases. Holding that an act of executive grace (1) can modify a judgment of trial court already rendered and in so doing (2) can negate appellate jurisdiction established by the General Assembly is a remarkable change to our separation of powers jurisprudence.

Express statutory language and constitutional concerns notwithstanding, the majority insists their result is correct if we look at context, legislative history, and purpose. *But see King*, 576 U.S. at 501 (Scalia, J., dissenting) ("[Context] is a tool for understanding the terms of the law, not an excuse for rewriting them."); *Schwegmann Bros.*, 341 U.S. at 395 (Jackson, J., concurring) ("Resort to legislative history is only justified where the face of the Act is inescapably ambiguous[.]"); *Kloeckner v. Solis,* 568 U.S. 41, 55 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity [of] the statute's text.").

Turning to the Criminal Procedure Act for justification, the majority contends N.C.G.S. § 15A-2000(d)(1) "creates an appeal of right to this Court." But this provision is not jurisdictional. Instead, it establishes the scope of judicial review. Put another way, N.C.G.S. § 15A-2000(d)(1) does not limit this Court's jurisdiction but rather describes what the Court reviews once jurisdiction is established in a capital case: punishment, arguments raised, and proportionality. *See* N.C.G.S. § 15A-2000(d)(1) (2025). Thus, N.C.G.S. § 7A-27(a)(1) is a specific statute which establishes

jurisdiction, while N.C.G.S. § 15A-2000(d)(1) more generally tells this Court what to review under the broader criminal procedure scheme.

The majority asserts that this Court is not free to "disregard what [subsection 15A-2000(d)(1)] tells us about legislative intent" because that subsection "directly concerns the very matter at issue—the right of direct appeal to this Court in capital cases." But as noted above, the characterization of subsection 15A-2000(d) as *directly* concerning this Court's jurisdiction over capital cases is more than a stretch. The majority acknowledges this when it states that subsection 15A-2000(d), "[u]nlike N.C.G.S. § 7A-27(a)(1) . . . delineates the parameters of our review of direct appeals in death penalty cases."

The only portion of subsection 15A-2000(d)(1) that could arguably be construed as touching on jurisdiction is the first sentence, which provides that our "automatic review" of capital cases is conducted "*pursuant* to procedures established by the Rules of Appellate Procedure." N.C.G.S. § 15A-2000(d)(1) (emphasis added). Interestingly and unsurprisingly, the Rules of Appellate Procedure echo the plain language and clear meaning of section 7A-27. *Compare* N.C. R. App. P. 4(d) ("An appeal of right from a judgment of a superior court by any person who has been convicted of murder in the first degree and sentenced to death shall be filed in the Supreme Court. In all other cases, appeal shall be filed at the Court of Appeals") *with* N.C.G.S. § 7A-27(a)(1) ("Appeal lies of right to the Supreme Court in . . . [a]ll cases in which the defendant is convicted of murder in the first degree and the judgment of the superior court

includes a sentence of death."); *see also* N.C.G.S. § 7A-27(b)(1) ("Except as provided in subsection (a) of this section, appeal lies of right of right directly to the Court of Appeals . . . [f]rom any final judgment of a superior court, other than one based on a plea of guilty or nolo contendere . . . .").

And ironically, although the Rules of Appellate Procedure undercut the majority's reasoning, the majority could achieve the same practical result by simply following N.C.G.S. § 7A-27 instead of judicially amending it. We could accept the properly noticed appeal, declare that the sentencing issues are moot, and remand consideration of other guilt-innocence phase issues to the Court of Appeals.

I certainly understand the appeal of the majority's result. Some could see it as being in our rational self-interest to seek less work for the Court. But if the legislature "enacted into law something different from what it intended, then it should amend the statute to conform to its intent." *King*, 576 U.S. at 515 (Scalia, J., dissenting).

Regardless, the specific jurisdictional statement in N.C.G.S. § 7A-27(a)(1) must control because that section unambiguously assigns this case to the Supreme Court of North Carolina, and nothing in the statute exempts commuted death sentences from its express terms. In discovering limits to this Court's jurisdiction which cannot be found in the statute, the majority abandons textualist dogma and replaces the legislature's unambiguous jurisdictional pronouncement with their preferred

language.  In so doing, the majority has committed the cardinal sin of legislating from the bench.